**Eric Scott BRANCH, Petitioner,**

v.

**James R. McDONOUGH,
et al., Respondents.**

**Case No. 4:06cv486–RH.**

United States District Court,
N.D. Florida,
Tallahassee Division.

March 30, 2010.

Eric S. Branch, Raiford, FL, pro se.

Michael Paul Reiter, Michael P. Reiter–Tallahassee FL, Venice, FL, for Petitioner.

Charmaine Mary Millsaps, Tallahassee, FL, for Respondents.

## ORDER DENYING THE PETITION

ROBERT L. HINKLE, District Judge.

A Florida state-court jury convicted the petitioner Eric Scott Branch of sexually battering and murdering a student who was walking to her car alone at night on a college campus. The jury recommended and the judge imposed the death sentence. Mr. Branch was unsuccessful on direct appeal and in a state-court collateral attack. He now has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He seeks relief on multiple grounds, including alleged errors by the trial judge and ineffective assistance of counsel. But the trial judge conducted a full and fair trial that was remarkably free of error. And Mr. Branch's attorney performed quite well. Mr. Branch lost not because of any ruling by the trial judge or any deficiency in his attorney's performance but because of the overwhelming weight of the evidence. This order denies the petition.

### Facts and State–Court Proceedings

#### Ms. Morris

Susan Morris was a student at the University of West Florida. Her last class on Monday, January 11, 1993, ended at about 8:20 p.m. She walked alone to her car, a red Toyota Celica with an after-market black antenna and a broken left taillight. The car was near the far end of what was, at that time of night, an isolated parking lot. She never made it into the car. She was savagely beaten, sexually assaulted with a stick from a tree branch, strangled, and left dead in the nearby woods covered with leaves and branches. The medical examiner, who has conducted thousands of autopsies, testified that he will always remember this one because of the extent of the injuries.

#### Mr. Branch

Mr. Branch, who was 23, left his home in Indiana and moved to Panama City, Florida, where his cousin was a college student, in November 1992. Mr. Branch soon learned that an Indiana warrant was out for his arrest. He may not have known precisely why. As it turns out, the warrant was issued because, through an error, he had been released too early from a prison sentence for sexual battery on a 14–year–old girl. Mr. Branch may or may not have known that Florida authorities also were looking for him in connection with an unrelated sexual battery.

After arriving in Florida, Mr. Branch initially lived with his cousin. Mr. Branch parked the car he drove—an old Pontiac Bonneville that his grandfather had provided—in the lot of the condominium building next door, so that if law enforcement officers found the car, they would not also find him. In early January 1993, the car was towed, apparently because it was parked in the condominium lot without permission. Mr. Branch began staying with others, fearing arrest if he stayed with his cousin. Meanwhile, Mr. Branch's brother, who had come to Florida to visit Mr. Branch and the cousin, retrieved the Pontiac from the impound lot. On Friday, January 8, 1993, Mr. Branch used his key to take the car without telling his brother or cousin. Mr. Branch's aunt, who also was visiting from Indiana, reported the car missing.

On Friday, January 8, 1993, Mr. Branch headed west to Pensacola in the Pontiac. He was at a nightclub for most of the night. He checked into a motel at about 6:00 a.m. He slept, ate, and went to the University of West Florida in the early afternoon on Saturday, January 9. Mr. Branch went to the Rathskeller, an on-campus hangout, and befriended a student. Mr. Branch took her to the same nightclub

he had visited the night before and told her he had met a member of a band. Mr. Branch and the student later went to his motel room, where they spent the night. They spent all day Sunday together as well, eventually spending the night in the student's dormitory room.

Mr. Branch and the student were apart while she attended classes on Monday, January 11, but Mr. Branch saw her before and after. They ate dinner together at the Rathskeller. At perhaps 6:30 p.m., the student left to study. They planned to meet again, either at the Rathskeller or in the library, when she finished studying.

The student studied for a couple of hours and went to meet Mr. Branch. He was not at the Rathskeller or in the library. Unable to find him, the student turned to other activities. She called her own room to check for messages at about 10:30 or 11:00 p.m., and, to her surprise, Mr. Branch answered; she had told him where to find the key. The student returned to the room, where she noticed that Mr. Branch's boots were wet and that he had a cut on his hand. He said he had met some people at the Rathskeller, gone with them to a bar, and gotten in a fight when they tried to make him pay for all the drinks. The student and Mr. Branch again spent the night together in the dormitory room. Mr. Branch left early on the morning of Tuesday, January 12. The student did not hear from Mr. Branch again.

As it turns out, Mr. Branch went at least two places while the student was unable to find him on Monday evening. He drove to the Pensacola airport, parked, and took a taxi back to campus. And he went to the remote parking lot, encountered Ms. Morris, and stole her red Toyota. All of this he admits. What else he did to her is disputed.

Mr. Branch left Pensacola on Tuesday, January 12, headed back to Panama City in the red Toyota. His goal was to pick up his paycheck from a fast-food restaurant where he had briefly worked. He stopped on the way at a store where a friend worked. Mr. Branch later made it to Panama City and met up with his brother and cousin. The friend, the brother, and the cousin all saw that Mr. Branch was driving the red Toyota. He told his cousin that he had gotten it from a girl in Pensacola who attended the University of West Florida. The brother and cousin both noticed the car's after-market black antenna, and the cousin noticed its broken left taillight.

Mr. Branch left Pensacola headed back north, making it to Bowling Green, Kentucky. He spoke with a student at a university dormitory there. Mr. Branch abandoned the red Toyota on a nearby street and called his grandfather, who lived not far across the state line in Indiana, to pick him up. After arriving in Indiana and speaking with his attorney, Mr. Branch turned himself in. An officer who took his fingerprints noticed a cut on his hand.

### *The Investigation*

Ms. Morris's father reported her missing early on Tuesday, January 12. Officers soon began connecting the dots. Panama City officers had put out a be-on-the-lookout bulletin or "BOLO" on the Pontiac, as part of their unrelated effort to find Mr. Branch. Pensacola officers put out a BOLO on the red Toyota. As part of the effort to find Mr. Branch, Panama City officers talked with his cousin and brother, who said Mr. Branch was driving a red Toyota. The officers matched up the BOLOs. Pensacola officers learned that the Pontiac had been seen on the West Florida campus and found it at the airport. They impounded the Pontiac while obtaining a warrant. Officers found the student with whom Mr. Branch had stayed, and she both identified him and turned over other evidence, including a tape case he had left

behind that, as officers eventually determined, had his fingerprints on it. A classmate knew where Ms. Morris had parked. With the help of a dog, officers found the body. After a warrant was obtained, a search of the Pontiac turned up bloody boots, clothes, and other evidence, including blood on the car's seats. Enzyme tests—and later DNA tests—matched some of the blood to Ms. Morris. A blood-splatter expert eventually concluded that the blood on the boots had come from medium-velocity splatter—consistent with a beating—and that the assailant most likely had been standing over and straddling the victim. Forensic tests on a towel from the student's room, that she said Mr. Branch had used after showering, found blood, but it did not match the DNA of either Mr. Branch or Ms. Morris.

### The Defense: Mr. Branch's Story

The obvious explanation for the evidence was that Mr. Branch committed the murder. He was on the campus; the proof of this was irrefutable. He stole Ms. Morris's car and drove it first to Panama City and then to Kentucky; the proof of this was irrefutable. Ms. Morris's blood was on Mr. Branch's boots and in the Pontiac; the proof of this was irrefutable, or nearly so. And he was not in the Rathskeller or library as he had said he would be. It was an exceptionally strong case.

Mr. Branch had the various law-enforcement reports available to him before the trial and studied most of them with care, as he has admitted. Trial Tr. 834–35. He testified at the trial and provided an account that, if believed, would explain most of the evidence—even the DNA on the towel that didn't match. The difficulty was that the explanation was and is more than a little farfetched.

Mr. Branch's story was this. On Monday evening, when the student with whom he had spent the last two nights left to go study, Mr. Branch was at the Rathskeller

and, to his surprise, saw the band member he had met at the nightclub on Friday, January 8. The band member's first name, like Mr. Branch's, was Eric. Mr. Branch was unsure of the last name; he could remember only that it was "Peters or St. Peters or St. Pierre or something to that effect." Trial Tr. 779.

Mr. Branch told the other Eric that he was on the lam and needed a car. The other Eric said he could hot wire one if Mr. Branch could get in. Soon Mr. Branch and the other Eric were in the parking lot looking for a car to steal.

They saw the red Toyota parked off by itself. Perfect. Mr. Branch was about to break in when they saw Ms. Morris coming. They sat on a curb at the side of the lot to avoid suspicion. After Ms. Morris arrived and opened the car, the other Eric went up and, to Mr. Branch's surprise, slugged her, rendering her unconscious. The other Eric said he was going to tie her up in the woods.

The other Eric carried Ms. Morris by the feet, and Mr. Branch carried her by the arms. Ms. Morris began to regain consciousness. The other Eric reached down and slugged her again. Mr. Branch dropped her and almost tripped over her— essentially straddling her as she lay on the ground, just as the blood-splatter expert said.

Mr. Branch was shaken and said he was going to sit in the car. The other Eric told Mr. Branch not to stay in the parking lot but to drive the car around and to come back to pick the other Eric up. Mr. Branch did it. When Mr. Branch picked the other Eric up, Mr. Branch noticed that the other Eric was wet, so Mr. Branch stopped at the dormitory of the student with whom he had spent the last two nights, went into her room, and took a towel. He brought it down to the car to let the other Eric use it to dry off. He

would later return it. This, the argument goes, accounts for the nonmatching DNA on the towel; it was the other Eric's.

Mr. Branch and the other Eric drove around for a time, and Mr. Branch saw a sign for the airport. He decided to park the car there overnight. Mr. Branch offered to take the other Eric home first, but the other Eric declined, saying he would take a taxi. Mr. Branch parked at the airport, and the other Eric moved over into the driver's seat to listen to music. Mr. Branch took a taxi back to campus, expecting the other Eric to take a taxi to his home.

Mr. Branch says that after arriving back on campus, he went to the room of the student with whom he had spent the last two nights, precisely as she said. He spent the night and left the next morning, precisely as she said. He denied, though, that he had a cut on his hand or said he got it in a fight.

This story, without more, would have the wrong car abandoned at the airport. But Mr. Branch had an explanation for this, too. He said that when he left the campus on Tuesday morning, he drove the Pontiac to the airport, left it there, and picked up the red Toyota. Mr. Branch said the other Eric had left the Toyota unlocked with the keys on the floor so that Mr. Branch could pick it up. He offered no explanation of why the other Eric—a murderer and car thief—would be so accommodating to a casual acquaintance, but perhaps he, unlike Mr. Branch, did not want to be associated with the murder victim's car. Mr. Branch also offered no explanation for why the other Eric, who had driven his own car on Friday night, was at the Rathskeller on Monday without a car.

### The Verdict and the Penalty Phase

The jury found Mr. Branch guilty of first-degree murder, sexual battery with great force, and grand theft of the car.

The jury plainly did not believe Mr. Branch's story.

During the penalty phase, the state introduced a certified copy of the abstract of the Indiana judgment convicting Mr. Branch of sexual battery. During the guilt phase, the jury had learned only that there was a warrant for Mr. Branch's arrest, not the nature of the charge that led to it. The jury never learned of the unrelated Florida sexual battery.

During the penalty phase, Mr. Branch introduced the Indiana statute under which Mr. Branch was convicted. He also presented the testimony of his brother and grandfather. Their testimony established that Mr. Branch was born to a 15–year–old mother and 16–year–old father who soon divorced, that Mr. Branch's father abandoned the family, and that Mr. Branch's mother abandoned him to his grandfather for most of his life, separating him from his older—and apparently more favored—brother. Aside from the crimes of which Mr. Branch had been convicted, it was a sympathetic story.

The jury recommended a death sentence by a 10–2 vote. In determining the sentence, the judge considered the evidence presented during the guilt and penalty phases of the jury trial and additional evidence about the Indiana conviction. The judge sentenced Mr. Branch to death on the murder count and to consecutive prison sentences of life and five years on the other counts.

### The Direct Appeal and State Post–Conviction Proceedings

Mr. Branch appealed to the Florida Supreme Court. It affirmed. *Branch v. State (Branch I)*, 685 So.2d 1250 (Fla. 1996). Mr. Branch collaterally attacked the conviction and sentence under Florida Rule of Criminal Procedure 3.850. The trial court conducted an evidentiary hearing and rejected the challenge. Again the

Florida Supreme Court affirmed. *Branch v. State (Branch II )*, 952 So.2d 470 (Fla. 2006).

### Federal Habeas Petition

Mr. Branch's federal petition asserts these claims, though not in this order: (1) ineffective assistance of counsel in (a) not filing a motion to suppress the evidence seized from the Pontiac, (b) not hiring a blood-spatter expert, (c) not hiring a forensic pathologist to rebut the medical examiner's testimony about the stick found in Ms. Morris's vagina and the effect of the ligature found around her neck, (d) insufficiently investigating and presenting evidence in mitigation, and (e) not challenging on direct appeal the admission of DNA evidence; (2) the court's failure to conduct a hearing on Mr. Branch's attorney's competence; (3) the court's refusal to again continue the trial; (4) the prosecutor's references to Mr. Branch's failure to disclose the other-Eric story prior to the trial; (5) the court's refusal to give a requested jury instruction further defining the term "mitigation"; (6) the admission, during the penalty phase, of evidence of Mr. Branch's sexual-battery conviction in Indiana, without a showing that it was a crime of violence and a felony as required for use as an aggravating circumstance under the Florida death-penalty statute; and (7) the state's failure to provide additional postconviction resources to hire additional postconviction experts.

### Standard of Review

Mr. Branch filed this case after the effective date of the Antiterrorism and Effective Death Penalty Act. The Act thus governs this case. The Act requires a federal habeas petitioner who is challenging a state-court conviction or sentence to exhaust state remedies. The Act allows a federal court to grant relief only if the state courts' rejection of a claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A long and ever-growing line of decisions elaborates on these standards. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318 (11th Cir.2002). No purpose would be served by plowing this ground again in this order.

### Merits

### I. Ineffective Assistance of Counsel

The standards that govern ineffective-assistance claims are set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The test is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686., 104 S.Ct. 2052 In order to prevail, a petitioner must show that (1) the attorney fell short of reasonably competent performance as defined by prevailing professional standards, and (2) it affected the outcome. *Id.* at 687, 104 S.Ct. 2052.

In assessing an attorney's performance, a reviewing court must be "highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. As the Eleventh Circuit has explained:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.

*White v. Singletary,* 972 F.2d 1218, 1220 (11th Cir.1992); *see also Stewart v. Sec'y, Dept. of Corr.,* 476 F.3d 1193, 1209 (11th Cir.2007) ("Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" (quoting *Chandler v. United States,* 218 F.3d 1305, 1315 (11th Cir.2000))).

In rejecting Mr. Branch's ineffective-assistance claims, the Florida Supreme Court correctly identified *Strickland* and its progeny as setting out the governing standards.

### A. Motion To Suppress

■ Mr. Branch asserts that his attorney was ineffective in failing to move to suppress the evidence seized from the Pontiac that Mr. Branch left at the airport. Although a state court's denial of a motion to suppress is not itself reviewable on a federal habeas petition, an attorney's ineffective assistance in connection with a motion to suppress *is* reviewable. *See Huynh v. King,* 95 F.3d 1052, 1056 (11th Cir.1996) (citing *Kimmelman v. Morrison,* 477 U.S. 365, 382–83, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)).

The Florida Supreme Court concluded that the attorney's decision not to file a motion to suppress was not unreasonable and did not fall below prevailing professional standards. *Branch II,* 952 So.2d at 476. The court also said that any motion to suppress "would have been properly denied." *Id.*

■ The ruling was correct. When officers located the Pontiac at the airport, they knew these things: a warrant was out for Mr. Branch's arrest; he had been driving the Pontiac in Panama City; the Pontiac was now in Pensacola; Ms. Morris had gone missing in Pensacola; her red Toyota, which had an after-market black antenna and broken left taillight, also was missing; Mr. Branch's brother and cousin had seen him driving a red Toyota; the brother and cousin both noticed that the Toyota had a black antenna; the cousin noticed it had a broken left taillight; and Mr. Branch said he got the car from a student at the University of West Florida in Pensacola. The officers looked in the trunk for a body but then waited for a search warrant. By the time they got it, officers had found Mr. Morris's body in the woods.

These facts easily established probable cause to believe the vehicle contained evidence of a crime. *See, e.g., United States v. Magluta,* 418 F.3d 1166, 1182 (11th Cir. 2005) ("Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quotations omitted)); *United States v. Alexander,* 835 F.2d 1406, 1409 (11th Cir.1988) ("Probable cause to search exists 'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" (quoting *United States v. Clark,* 559 F.2d 420, 424 (5th Cir.1977)) (alteration in original)). And though it was commendable for the officers to wait for a warrant before searching the car—other than by looking in the trunk for a body—they need not have done so. *See Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (holding that officers may search an automobile without a warrant based on probable cause and exigent circumstances); *see also Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) ("[W]arrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed or evidence in it [being] destroyed were remote, if not nonexistent.").

To be sure, Mr. Branch says the affidavits submitted with the warrant application included false or misleading statements about what Mr. Branch's brother, cousin, and aunt had told officers. He says the brother and cousin did not say the red Toyota they saw Mr. Branch driving had a black antenna and broken left taillight and that the aunt had not reported the Pontiac missing. Leaving aside the question of whether a warrant was needed at all, and even assuming that the challenged statements were untrue, any motion to suppress still would have been unfounded. In *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Court held that in order to successfully challenge a search based on a warrant obtained through an affidavit that contained a false statement, a defendant must show that the false statement was made knowingly, or with reckless disregard for its truth, and that probable cause would not have existed without the false statement.

The facts remaining after deleting the statements challenged by Mr. Branch would still easily be sufficient to establish probable cause. The black antenna and broken taillight provided further support for the assertion that Mr. Branch was driving Ms. Morris's car, but the inference that he was driving her car was strong even without this evidence. This was, after all, a red Toyota that Mr. Branch said he got from a student in Pensacola. And whether the aunt reported the Pontiac missing made little difference. It was a Pontiac associated with Mr. Branch, the person more recently seen driving the red Toyota.

Moreover, the record supports, if it does not compel, a finding that the statements in the affidavit were true. Mr. Branch's brother and cousin each told officers that they had seen Mr. Branch driving a red Toyota on Tuesday, January 12. The cousin said the Toyota had a black antenna and a "busted-out left turn signal." Trial Tr. 575–76. The brother said the Toyota had a black antenna. *Id.* at 1439. And the aunt had reported the Pontiac missing. *Id.* at 565. Indeed, the fact that the aunt had reported the Pontiac missing—or the more damning fact that it was believed to have been in Mr. Branch's possession—is irrefutably corroborated by the fact that the Pontiac was the subject of a BOLO that led to its discovery at the airport in the first place. In short, Mr. Branch has not shown that the statements in the affidavit were false or that, without them, the affidavit would have been insufficient to establish probable cause.

Mr. Branch also says the search warrant was overly broad and unsupported by probable cause because there was no reason to believe that any clothing, personal items, or trace evidence would be found in the Pontiac. But as set out in the affidavits, the officers' experience in numerous homicide investigations was that this kind of evidence is commonly found in a homicide suspect's vehicle, even if the vehicle is not directly used in the crime. Common sense supports the conclusion. There was probable cause. *See United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991) (noting that substantial weight is given to the officer's experience in assessing whether probable cause exists); *see also United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir.1985) ("[W]e have upheld warrants when the description is as specific as the circumstances and the nature of the activity under investigation permit.").

A reasonable attorney sometimes—one would hope often—decides not to file a plainly unfounded motion. The Florida Supreme Court's holding that Mr. Branch's attorney did not provide ineffective assistance by failing to move to sup-

press evidence from the Pontiac was correct. Even more clearly, the holding was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

### B. Not Hiring a Blood–Spatter Expert

Mr. Branch asserts his attorney should have hired a blood-spatter expert. The state's expert said the blood on Mr. Branch's boots came from medium-velocity spatter consistent with a beating, that the boots and blood source were in the same plane, and that the most likely explanation was that the person wearing the boots was standing over and straddling the victim at the time of the beating. Mr. Branch now has proffered an expert's testimony that this is only one possible explanation for the blood pattern on the boots.

The testimony almost surely would have made no difference. Mr. Branch's testimony was that he was indeed present when the other Eric slugged Ms. Morris. He said he dropped her and almost tripped over her—that she was indeed on the ground with him straddling her just after she was slugged. Mr. Branch's attorney asserted in closing argument that the state's blood-spatter testimony was fully consistent with Mr. Branch's account of the events. Calling an expert to say it might not have happened that way would have served little purpose.

The Eleventh Circuit has upheld an attorney's tactical decision not to call an expert under similar circumstances. In Williams v. Kemp, 846 F.2d 1276 (11th Cir.1988), the defendant admitted being present at the time of a murder. The state presented expert testimony about blood on the defendant's boot. The defendant presented no expert testimony to the contrary. The defendant later asserted that this constituted ineffective assistance. The Eleventh Circuit rejected the claim, concluding that the "decision not to call a defense expert to challenge the blood stain on Williams' boot was a deliberate tactical decision" based on "the fact that the blood . . . was consistent with the defense's theory of the case." Williams, 846 F.2d at 1280–81.

Here, as in Williams, the attorney did not render ineffective assistance by deciding not to call an expert to rebut evidence that was consistent with the defense theory of the case. And that conclusion is even more clearly correct here than in Williams, because here, calling an expert would have forfeited an important procedural right.

Under Florida law at the time of this trial, the sequence of closing arguments turned on whether a defendant presented evidence other than his own testimony. If the defendant presented no evidence, or only his own testimony, the defendant was entitled to present the first and last closing argument, with the state in the middle. But if the defendant presented other evidence, the state went first and last, with the defendant in the middle. Attorneys believe, perhaps with some validity, that this matters. Rare is the attorney who voluntarily cedes the last word to the adversary.

Mr. Branch's attorney decided, as a matter of strategy, to present no evidence other than Mr. Branch's own testimony, thus obtaining the first and last argument. The Florida Supreme Court held this a reasonable strategy, Branch II, 952 So.2d at 479, as indeed it was, especially in light of Mr. Branch's story. The story was not likely to work, as the attorney must have recognized. But the chance was better if, as happened, he had the last argument and thus was able to present some explana-

tions of the evidence without a response from the state.

The Florida Supreme Court's ruling that the attorney did not render ineffective assistance by failing to call a blood-spatter expert was correct. The conclusion was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

### C. Not Hiring a Forensic Pathologist

■ Mr. Branch asserts his attorney should have hired a forensic pathologist to contest the medical examiner's testimony on two subjects: the stick found in Ms. Morris's vagina, and the effect of the ligature found around her neck.

The medical examiner testified that the stick probably was put in Ms. Morris's vagina while she was alive. This was essential to the sexual-battery conviction, and the sexual battery was in turn a death-penalty aggravating factor. On cross-examination, the medical examiner said it was possible, though unlikely, that the stick entered the vagina while the body was being dragged through the woods. At the postconviction hearing, Mr. Branch presented the testimony of a forensic pathologist that the stick could have entered after death while the body was being dragged.

The medical examiner also testified that the ligature found around Ms. Morris's neck did not kill her. At the postconviction hearing, Mr. Branch's pathologist testified the ligature could have killed her. This matters, Mr. Branch asserts, because merely strangling an unconscious person is not "heinous, atrocious, or cruel"—one of the aggravating factors underlying Mr. Branch's death sentence. Beating a body after death also is not heinous, atrocious, or cruel. *See Buzia v. State,* 926 So.2d 1203, 1212 (Fla.2006) ("[N]othing done to the victim after the victim is dead or unconscious can support [the heinous, atrocious, or cruel] aggravator."); *Jones v. State,* 569 So.2d 1234, 1238 (Fla.1990).

The expert testimony that Mr. Branch now proffers—that the stick may have entered Ms. Morris's vagina after death while the body was being dragged, and that the ligature could have killed her—would have accomplished little. The suggestion that the stick entered the vagina accidentally is farfetched, the medical examiner's testimony about both the stick and the ligature was clear and credible, and the newly proffered testimony probably would have persuaded the jury of nothing. Indeed, the suggestion about the stick is both contrary to Mr. Branch's own testimony that Ms. Morris was fully clothed while being carried into the woods and so contrary to common sense that introducing expert testimony on this might have served primarily to undercut the defense's overall credibility. And if offered during the guilt phase, the evidence would have forfeited the right to the first and last closing argument.

The Florida Supreme Court's ruling that the attorney did not render ineffective assistance in this respect was correct. The ruling was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

### D. Mitigation Evidence

■ Mr. Branch's brother and grandfather testified for Mr. Branch during the penalty phase. Mr. Branch now says the attorney was ineffective in failing to find and present additional mitigation evidence. Mr. Branch says the attorney should have obtained "school records, medical records,

or any other background records pertaining to [his] history." (Pet. 62.)

At the postconviction hearing, Mr. Branch presented the testimony of Dr. Henry Dee, a neuropsychologist. Mr. Branch contended that Dr. Dee's testimony established three statutory mitigators. The first was that Mr. Branch was suffering from extreme emotional distress because he was on the run from two outstanding arrest warrants and had consumed alcohol. The second was that Mr. Branch had a ·personality disorder that rendered him unable to conform his actions to the law. The third was that Mr. Branch had been substantially dominated by another person—the other Eric—because of the physical disparities between the two. *Branch II,* 952 So.2d at 477.

The Florida Supreme Court rejected this claim. The court said Mr. Branch suffered no prejudice from the failure to present additional mitigation evidence, and it specifically addressed the disparity between Mr. Branch's contentions and the facts:

> The idea that counsel was ineffective for failing to present evidence **that** *the defendant was on the run from two separate charges of sexual battery* as mitigation is so absurd that the Court finds that the defendant could not have suffered any prejudice as a matter of law. Further, the jury and the Court rejected the story that the defendant had an accomplice, as illustrated in the sentencing order. The defendant's characterization that the expert's testimony proved the defendant could not conform his actions to the law is patently incorrect. In fact, the defendant's expert, Dr. Henry Dee, testified during cross-examination to the exact opposite conclusion on all three of these mitigators:
>
> Q .... And in this particular instance, based on what you reviewed, there's no clinical diagnosis *that the*

*defendant was under any extreme mental or emotional disturbance?*

A .... *That's correct.*

Q. No indication that the defendant was under the duress of any other person?

A. That's correct.

Q. Isn't it true that you found that the defendant was, in fact—had the ability, the capacity, to appreciate the criminality of his conduct?

A. Yes.

Q. He had the ability to *conform his conduct to the requirements* of the law; isn't that also correct?

A. Yes. I *think it was impaired* but *certainly not obliterated.*

*Id.* (emphasis by the Florida Supreme Court).

The Florida Supreme Court concluded that Dr. Dee's testimony would not have helped Mr. Branch and might have *harmed* him. Evidence that Mr. Branch suffered from antisocial personality tendencies would have negated the only mitigator Mr. Branch was credited with: having good personality traits. *Id.* And emphasizing that Mr. Branch was fleeing from two outstanding arrest warrants would have come close to an aggravating factor: that a "capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Fla. Stat. § 921.141(5)(e).

 The United States Supreme Court and the Eleventh Circuit have repeatedly addressed the application of *Strickland* to ineffective-assistance claims based on the failure to investigate or present mitigation evidence. The reviewing court asks "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing

court." *Henyard v. McDonough,* 459 F.3d 1217, 1242 (11th Cir.2006). In determining whether an investigation was reasonable, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith,* 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). More recent decisions have continued to adhere to the same principles. *See, e.g., Wong v. Belmontes,* 558 U.S. ——, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook,* 558 U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009).

Mr. Branch has the burden of showing that his attorney's performance caused prejudice—that is, that the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. The standard for prejudice is high: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. 2052.

Mr. Branch's attorney spoke with Mr. Branch about his family background. He spoke with, and reviewed the notes of, Mr. Branch's prior attorney. That attorney had traveled to Indiana to speak with family and friends, and with Mr. Branch's attorney there, in search of mitigation evidence. The prior attorney hired a confidential mitigation consultant, whose conclusions did not help. Significant evidence over and above the testimony that Mr. Branch's brother and grandfather provided during the penalty phase was not found then and has not been proffered now. This was not a case where the defense attorney did not adequately look for mitigation evidence. It was, instead, a case where additional, persuasive mitigation evidence did not exist.

To be sure, Mr. Branch makes vague references to head injuries he sustained or potential abuses he may have suffered. But Mr. Branch has proffered no significantly mitigating evidence, even now. He has failed to demonstrate that he suffered prejudice from any deficiencies in the attorney's investigation of mitigating circumstances. Mr. Branch thus is not entitled to relief. *See Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527 ("In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense.... In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); *Burger v. Kemp,* 483 U.S. 776, 793–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (holding that an attorney does not render ineffective assistance by failing to find and present evidence that would not have helped); *McClain v. Hall,* 552 F.3d 1245, 1251–54 (11th Cir. 2008) (rejecting the petitioner's claim of ineffective assistance for failure to discover and present mitigation evidence and noting, "[w]e may decline to decide whether the performance of counsel was deficient if we are convinced that [the petitioner] was not prejudiced"); *Grayson v. Thompson,* 257 F.3d 1194, 1225 (11th Cir.2001) ("Even assuming *arguendo* ineffective assistance in the mitigating case at sentencing, there is no reasonable probability that the balance of aggravating and mitigating circumstances that led to the imposition of the death penalty in this case would have been different had counsel introduced the evidence compiled and presented in [petitioner's] state habeas proceedings.").

The Florida Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable deter-

mination of the facts. Mr. Branch is not entitled to relief on this claim.

### E. DNA Evidence

 Mr. Branch asserts that his attorney was ineffective in failing to challenge on direct appeal the trial court's decision to admit the state's DNA evidence. The claim is that the evidence was inadmissible under state law, and that the attorney should have so asserted on appeal. The dispositive answer is that the Florida Supreme Court later ruled, in the collateral proceeding, that the evidence was admissible under state law. *See Branch II*, 952 So.2d at 483. A petitioner obviously is not entitled to relief on a claim that an attorney was ineffective in failing to raise on appeal a claim that—as we now know from the Florida Supreme Court's later ruling—ultimately would have failed. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (reversing the grant of habeas relief based on the state court's erroneous admission of evidence under state law: "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Moreover, the DNA evidence was consistent with Mr. Branch's own testimony. He said he was at the scene. He explained the blood on his boots. The DNA evidence was important when it came in; it confirmed the state's other evidence—already quite strong—that Mr. Branch was at the scene of the murder. But by the time of the appeal, Mr. Branch had already testified that he was indeed there. By that point, the DNA evidence was of little importance. A good appellate attorney often foregoes weak arguments about issues that make little difference. The attorney did not render ineffective assistance by failing to raise the DNA issue on appeal.

The Florida Supreme Court's rejection of this ineffective-assistance claim was correct. The ruling was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

### II. Failure to Conduct a Hearing on the Attorney's Competence

 Mr. Branch asserts that the trial court erred by not holding a hearing or otherwise inquiring into the competence of his retained attorney—the attorney who represented Mr. Branch at the trial. A sufficient answer is the trial transcript considered as a whole. The attorney held a hand full of low cards but played them well. He rendered wholly effective assistance. The assertion that there is some free-standing federal constitutional right to a hearing on an attorney's competence—separate and apart from the right to effective assistance—is not correct.

### III. Denial of Another Continuance

 Mr. Branch asserts that the trial court violated his Sixth and Fourteenth Amendment rights by denying his requests to delay the trial. An appointed attorney had represented Mr. Branch beginning in June 1993. Mr. Branch's grandfather retained an attorney for Mr. Branch at the beginning of November 1993. The trial was set for that same month, but it was continued twice more, to March 7, 1994. The retained attorney thus had four months to prepare for the trial, and he had the benefit of five more months of work done by the original attorney.

The Florida Supreme Court rejected this claim on direct appeal. *See Branch I*, 685 So.2d at 1252. The court said that

denying another continuance was not an abuse of discretion.

 The decision whether to grant a continuance "requires a delicate balance between the defendant's right to adequate representation by counsel of his choice and the general interest in the prompt and efficient administration of justice." *United States v. Baker*, 432 F.3d 1189, 1248 (11th Cir.2005). The burden on a federal habeas petitioner challenging a state court's denial of a continuance is especially high, because the issue is not simply the trial court's exercise of discretion, but whether the denial of a continuance violated the Constitution. As the Supreme Court has said:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel.

*Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

Even with years to prepare his collateral attack, Mr. Branch still has pointed to nothing he could have done to achieve a different outcome in the case. The trial ended as it did not because it occurred too soon but because of the evidence. The denial of a further continuance was not an abuse of discretion. *See United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995) (rejecting a challenge to the denial of a continuance: to obtain relief, "a defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice").

The Florida Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

### IV. The Prosecutor's References to Mr. Branch's Failure to Disclose the Other–Eric Story Prior to the Trial

 Mr. Branch told the other-Eric story for the first time from the witness stand. The prosecutor noted several times that Mr. Branch had not told the story earlier. The defense objected to some of the references. The court sustained each defense objection. The defendant moved for a mistrial, and the court denied the motion. The defendant did not ask for a curative instruction.

Mr. Branch asserts that the prosecutor's remarks constituted unconstitutionally comments on the right to remain silent. On direct appeal, the Florida Supreme Court rejected the claim without discussion. The decision is nonetheless entitled to deference. *See Blankenship v. Hall*, 542 F.3d 1253, 1271 (11th Cir.2008) ("We have repeatedly held 'a state court's summary rejection of a claim qualifies as an adjudication on the merits under § 2254(d) so as to warrant deference.'") (quoting *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir.2008)).

The clearly settled law was and is this. The state was free to prove and to argue that Mr. Branch did not call for emergency assistance or call the police when the other Eric slugged Ms. Morris. The state was free to prove and to argue that Mr. Branch fled without telling anyone what he saw or knew. But when Mr. Branch was eventually arrested, he of course was advised of his right to remain silent, in accordance with *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state was constitutionally prohibited from commenting on Mr. Branch's silence from the point when he was read his rights under *Miranda* to the time

when he took the witness stand. *Compare Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (holding that a prosecutor may not impeach a defendant's exculpatory story by cross-examining about the failure to tell the story after *Miranda* warnings were given), *with Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (reversing a circuit court decision that applied *Doyle* to post-arrest, pre-*Miranda* silence), *United States v. O'Keefe*, 461 F.3d 1338, 1346 (11th Cir.2006) (noting that the *Doyle* principle "derives from the implicit assurance of the *Miranda* warnings" and that "due process is not violated by the use for impeachment purposes of a defendant's silence prior to arrest, or after arrest if no *Miranda* warnings are given"), *and United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir.1991) ("The government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given.").

Some but not all of the prosecutor's comments ran afoul of the *Doyle* principle. The chronology was this. The defense reserved its opening to the end of the state's case. The state thus presented its case with no inkling of the other-Eric story. The story first made an appearance when Mr. Branch testified on direct examination. On cross, the prosecutor asked, "What have you done to help catch the other Eric?" Trial Tr. 829. The defense objected, out of the jury's hearing, that this violated Mr. Branch's constitutional right to remain silent. The court sustained the objection within the jury's hearing.

A few minutes later, Mr. Branch himself brought the subject back up. The prosecutor asked whether Mr. Branch had helped kill Ms. Morris by carrying her into the woods and holding her while the "mystical Eric" hit her again. Mr. Branch said he did not help kill her and added: "And

he isn't mystical. I hope he will be found in the next few days." (*Id.* at 843.) The prosecutor took the opening, asking whether Mr. Branch would help, and adding, "As you have in the past, right?" (*Id.* at 844.) Mr. Branch responded that he was advised by his attorney not to speak to law enforcement. There was no objection during this exchange.

The subject next arose during the state's closing argument. The prosecutor argued that after carefully listening to the state's case, Mr. Branch "concocted a story for you." (*Id.* at 887.) The prosecutor said that during the trial, before this "first-time revelation about another Eric, there was no admission about the blood on the boots." (*Id.*) The defense objected. Out of the jury's hearing, the court sustained the objection, denied a motion for mistrial, and told the prosecutor he was "treading on very thin ice." (*Id.*) But the prosecutor did not heed the comment. Back before the jury, the prosecutor said that "now we learn" that there is no issue about the blood on the boots or Mr. Branch driving the red Toyota. (*Id.* at 888.) There was no renewed objection.

Later, the prosecutor referred once more to the story about the other Eric "that we hear for the first time today." (*Id.* at 897.) There was no objection.

 Some, though not all, of the prosecutor's comments were constitutionally impermissible. In denying relief on this basis, the Florida Supreme Court most likely held the comments harmless beyond a reasonable doubt. That would be a reasonable conclusion. In this court, Mr. Branch would be entitled to relief only if the improper comments had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). They plainly did not. The jury was entitled to consider the im-

plausibility of the other-Eric story and, more importantly for present purposes, to consider that a person unwittingly drawn into another person's violent activities, as Mr. Branch says occurred here, would most likely flee and report the matter to authorities, rather than help carry the body into the woods, give the perpetrator a towel and a ride, and remain silent. The prosecutor's comments went further, noting that Mr. Branch had failed to cooperate in finding the other Eric in the run up to the trial and had failed to tell his story until he was on the stand. This was improper, but the marginal impact of these suggestions was surely slight. Nobody reading this entire transcript would conclude that these isolated comments made a difference.

The Florida Supreme Court's holding that Mr. Branch was not entitled to relief on this basis was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

## V. Jury Instruction Further Defining Mitigation

■ The court instructed the jury in the penalty phase that the jury could consider only specified aggravating circumstances but that the jury could consider in mitigation not only specified circumstances but also "any other aspect of the defendant's character or record or any other circumstances of the offense." Trial Tr. 1029. Mr. Branch asserts that the court should have given an additional instruction defining mitigation more precisely.

The Florida Supreme Court rejected the claim without discussion. *See Branch I,* 685 So.2d at 1253.

■ The United States Supreme Court has held that when a court instructs on mitigation, as the trial court did here, the

relevant inquiry is only "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). If the answer is no, a more explicit instruction is not constitutionally required. *Id.; see also Brown v. Payton,* 544 U.S. 133, 147, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005) (upholding an instruction that "by its terms directs jurors to consider any other circumstance that might lessen a defendant's culpability"). Here there is no chance the jury understood the instruction to foreclose the consideration of any conceivable mitigating circumstance. A further instruction was not required.

In asserting the contrary, Mr. Branch relies on a single dissent from a denial of certiorari. *See Watkins v. Murray,* 493 U.S. 907, 908, 110 S.Ct. 266, 107 L.Ed.2d 216 (1989) (Marshall, J., dissenting). The dissent plainly does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

The Florida Supreme Court's rejection of this claim was correct. It was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

## VI. Admission of Mr. Branch's Indiana Conviction as a Crime of Violence

Under the Florida death-penalty statute, an aggravating circumstance is that the defendant was previously convicted of "a felony involving the use or threat of violence to the person." Fla. Stat. § 921.141(5)(b).

██ During the penalty phase, the state moved to admit a certified copy of an abstract of an Indiana judgment convicting Mr. Branch of sexual battery. Mr. Branch objected on the ground that the state had not shown that sexual battery as defined in Indiana was a crime of violence within the meaning of the Florida death-penalty statute. The court overruled the objection. On direct appeal, the Florida Supreme Court upheld the ruling without discussion.

██ Later, in postconviction proceedings, Mr. Branch expanded the claim, saying the state also failed to show that the conviction was for conduct that, in Florida, would constitute a felony. The postconviction court rejected the claim, and the Florida Supreme Court upheld the ruling, concluding that Mr. Branch procedurally defaulted the claim by failing to raise it at trial or on direct appeal. *Branch II*, 952 So.2d at 481. The procedural-default holding was correct and is entitled to deference here. *See Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir.1999) ("where the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred *Sykes* requires the federal court to respect the state court's decision") (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977)).

The state proved the Indiana conviction by introducing a certified abstract of it. R. 1165. The abstract shows that Mr. Branch was convicted of sexual battery, a felony under Indiana law, and was sentenced to three years in prison, with one year suspended. A defendant was guilty of sexual battery under Indiana law if he (1) touched another person, (2) with the intent to sexually arouse the defendant or the other person, (3) when the other person (a) was compelled to act by force or the imminent threat of force or (b) was so mentally disabled or deficient as to be unable to consent. *See* Ind.Code Ann. § 35–42–4–8 (1991) (West).

Mr. Branch apparently concedes that compelling a person to engage in sexual conduct by force or imminent threat of force is a violent felony within the meaning of the Florida death-penalty statute. He asserts, though, that it is not a violent felony to engage in a sexual act without the use of force or a threat of force but instead with a person who is so mentally disabled as to be unable to consent. Mr. Branch was not convicted for a sexual act with such a person; he was convicted for forcing a nonconsenting 14–year–old to have sex. But he contends the abstract did not prove the underlying facts, as indeed it did not. The actual nature of the charge was proven to the court prior to sentencing, but it was not proven to the jury during the penalty phase that led to the jury's recommendation of the death sentence.

The Florida Supreme Court rejected Mr. Branch's claim without an explanation. The court may have concluded that having sex with a person too mentally disabled to consent is a violent crime within the meaning of the Florida death-penalty statute. Or it may have concluded that the sentencing judge was entitled to consider the actual nature of the offense as proven prior to sentencing, even though the nature of the offense was not proven to the jury. Or the court may have concluded that in light of the other aggravating circumstances, eliminating this one would have made no difference. None of these conclusions would entitle Mr. Branch to relief on his federal habeas petition.

First, it would not be unreasonable, and even more clearly would not be a violation of the federal Constitution, to read the Florida death-penalty statute's reference to a violent felony to include a conviction for a sexual act with a person too mentally

disabled to consent. *See Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475).

Second, prior to *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), nothing in federal law prevented a sentencing court from considering facts proven only to the court, not to a jury. *Ring* is not retroactively applicable to cases on collateral review, *see Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), so its impact on this principle need not be considered here. The sentencing court thus was entitled to consider the violent-felony aggravator, based on the Indiana conviction, even if the jury could not properly do so.

Third, Mr. Branch had two other statutory aggravators: the murder was especially heinous, atrocious, or cruel, and it was committed in conjunction with a sexual battery. Those were the aggravators mentioned most prominently at the trial and in the sentencing proceedings. The Indiana conviction was another weight on the scale. But the Florida Supreme Court reasonably could have concluded that any error was harmless—that without this aggravator, the balance still would have called for the death penalty. Nothing in federal law precluded the court from reaching this conclusion. *See Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (holding that when a trial court imposes a death sentence in a weighing state based partly on an invalid aggravator, an appellate court may affirm the sentence when the error is harmless beyond a reasonable doubt or the court reweighs the valid aggravating and mitigating factors and finds the death sentence

appropriate); *Jennings v. McDonough,* 490 F.3d 1230, 1248–51 (11th Cir.2007) (upholding a Florida death sentence based on the Florida Supreme Court's conclusion that an improper instruction on an aggravator was harmless but suggesting that the Florida Supreme Court does not reweigh aggravators and mitigators).

The Florida Supreme Court's rejection of Mr. Branch's challenge to the use of the Indiana conviction as a statutory aggravating factor was not contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts. Mr. Branch is not entitled to relief on this claim.

## VII. Postconviction Resources

Finally, Mr. Branch says that although the state paid for his postconviction attorney and experts, it imposed a cap that could be exceeded only with court approval. Mr. Branch says that in addition to the experts who provided testimony at the postconviction hearing, he wished to hire others, including, for example, an arborist to testify about the stick in Ms. Morris's vagina, or a fingerprint expert to try to find the other Eric by examining unidentified prints from the Pontiac. The suggestion to hire an arborist shows just how many resources an unchecked, imaginative attorney could consume.

The Constitution does not require the state to afford a postconviction defendant a blank check. Mr. Branch has had more than adequate resources, in state and now in federal court. The assertion that he has been denied constitutionally adequate resources to contest his conviction and sentence is far wide of the mark.

■ Moreover, Mr. Branch did not raise this claim in state court. He cannot properly pursue the claim here. *See Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct.

1347, 158 L.Ed.2d 64 (2004) ("Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." (citation and quotations omitted)). Mr. Branch is not entitled to relief on this claim.

### *Conclusion*

Mr. Branch sexually assaulted and brutally murdered a college student. He was convicted in a full and fair trial and sentenced to death. His challenges to the conviction and sentence are unfounded. Accordingly,

IT IS ORDERED:

The petition for a writ of habeas corpus is DENIED. The clerk must enter judgment and close the file. A limited certificate of appealability will be issued by separate order.